1

1             IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4   UNITED STATES OF AMERICA,     )
                          )   Case No. 09 CR 383
            Plaintiff,   )   Case No. 18 CR 484-1
5

6   -vs-                    )   Chicago, Illinois
                       )   May 30, 2019
  VICENTE ZAMBADA-NIEBLA,     )   10:31 a.m.
7

            Defendant.   )
8

9              TRANSCRIPT OF PROCEEDINGS
  BEFORE THE HONORABLE CHIEF JUDGE RUBEN CASTILLO
10

  APPEARANCES:
11

12  For the Government:    MS. ERIKA L. CSICSILA
                        MR. CHRISTOPHER P. HOTALING
                        MS. AMANDA LISKAMM
13                          MR. ANTHONY J. NARDOZZI
                        Assistant U.S. Attorneys
14                          219 S. Dearborn Street
                        Chicago, IL  60604
15                          (312) 353-5300
                        E-mail:  Erika.csicsila@usdoj.gov
16                                   Christopher.hotaling@usdoj.gov

17  For the Defendant:     MR. ALVIN S. MICHAELSON
                        1901 Avenue of the Stars
18                          Suite 615
                        Los Angeles, CA  90067
19                          (310)278-4984
                        E-mail:  Michaelsonlaw@justice.com
20

21  Court Reporter:

22            KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
              Official Court Reporter
23              United States District Court
      219 South Dearborn Street, Suite 2524-A
24             Chicago, Illinois  60604
            Telephone:  (312) 435-5569
25          Kathleen_Fennell@ilnd.uscourts.gov

1   APPEARANCES:   (Continued)

2   For the Defendant:     MR. FRANK A. PEREZ
                            Law Office of Frank A. Perez
3                           9110 Scyene Road
                            Dallas, TX  75227
4                           (214) 828-9911
                            E-mail:  Frank@frankperezlaw.com
5
                            MR. GEORGE L. SANTANGELO
6                           111 Broadway
                            New York, NY  10006
7                           (212) 269-4488

8                           MR. EDWARD S. PANZER
                            111 Broadway
9                           New York, NY  10006
                            (212) 514-5335

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings heard in open court:)

2         THE CLERK:  09 CR 383 and 18 CR 484, United States

3    versus Jesus Vicente Zambada-Niebla.

4         THE COURT:  Good morning.

10:31:31    5         MS. CSICSILA:  Good morning.

6         MR. PANZER:  Good morning, Your Honor.

7         THE COURT:  Good morning.

8         MR. PEREZ:  Good morning.

9         THE COURT:  Good morning, Mr. Perez.

10:31:47   10         So before we get started, let me just say that I'm

11   really going to ask members of the audience to respect the

12   proceedings that are occurring here.  These are real events,

13   not any type of soap opera events, and so I expect and I

14   demand that people behave appropriately in the courtroom.

10:32:16   15         So with that understanding, are both sides ready to

16   proceed to sentencing?

17         MS. CSICSILA:  Yes, Judge.  On behalf of the United

18   States, Erika Csicsila, Christopher Hotaling, both from the

19   Northern District of Illinois, and Amanda Liskamm and A.J.

10:32:32   20   Nardozzi from the District of Columbia.

21         THE COURT:  Okay.

22         MR. HOTALING:  Good morning.

23         THE COURT:  Good morning.

24         MR. PEREZ:  For the defense, Frank Perez.  Joining me

10:32:39   25   is co-counsel Alvin Michaelson, Ed Panzer and George

4

1    Santangelo.

2           MR. SANTANGELO:  Good morning, Your Honor.

3           MR. MICHAELSON:  Good morning, Your Honor.

4           THE COURT:  And let's swear in our interpreters.

10:32:48   5      (Interpreters sworn.)

6           THE COURT:  Okay.  And the defendant is present,

7    Jesus Vicente Zambada-Niebla.

8           First, let's start with the presentence investigation

9    report.  Have both sides had a full opportunity to review the

10:33:17  10   presentence report prepared by Ms. Kwong?

11           MS. CSICSILA:  Yes, Your Honor.

12           MR. PEREZ:  Yes, Your Honor.

13           THE COURT:  Are there any factual changes the

14   government wants to make to the report?

10:33:25  15           MS. CSICSILA:  No.

16           THE COURT:  Any on the part of the defense?

17           MR. PEREZ:  Yes, Your Honor.

18           THE COURT:  Go ahead.

19           MR. PEREZ:  As far as Paragraph 67, the last line --

10:33:33  20           THE COURT:  Okay.

21           MR. PEREZ:  -- says there's an attempt to kidnap him

22   and his wife.  It should just be him.  His wife was not

23   involved in that.

24           THE COURT:  Okay.  We will make that change in

10:33:47  25   Paragraph 67 so that it reads on the last line on Page 13,

5

1      "The defendant recalled someone attempting to kidnap him,"

2      period, and we'll leave the rest out.

3               MR. PEREZ:  That's correct, Your Honor.

4               THE COURT:  Anything else?

5               MR. PEREZ:  I do have one objection to the conditions

6      of pretrial -- I'm sorry -- supervised release.

7               THE COURT:  Okay.

8               MR. PEREZ:  Condition No. 6.

9               THE COURT:  Okay.  We'll get to that when we get to

10     that part --

11              MR. PEREZ:  Okay.

12              THE COURT:  -- of the sentence.

13              Let's then to -- any other factual issues?

14              MR. PEREZ:  No, Your Honor.

15              THE COURT:  And just for the record, Mr. Perez,

16     you've had a full opportunity to review the report with

17     Mr. Zambada-Niebla.

18              MR. PEREZ:  Yes, Your Honor.  I provided him with a

19     copy in Spanish, gave him time to review it, and we've

20     discussed on several occasions.

21              THE COURT:  Okay.  Let's then turn to the issue of

22     the initial application of the advisory sentencing guidelines,

23     and I know both sides have submitted very detailed and very

24     capable sentencing memorandums and attachments, and I've read

25     them very carefully.

1    But with regard to the initial application of the
2 advisory sentencing guidelines, is there any legal issue that
3 you want me to take care of?

4    MS. CSICSILA:  None on behalf of the government.  We
5 don't object to any of the guideline calculations in the PSR.

6    MR. PEREZ:  The defense has no objections, Your
7 Honor.

8    THE COURT:  Okay.  So just at the beginning of this
9 sentencing proceeding, we are starting at a total offense
10 level of 43; a Criminal History Category, which is the lowest
11 under the advisory sentencing guidelines, of a Roman Numeral
12 I; and the guideline range is a life sentence, but I know your
13 submissions are different and that the government is asking me
14 to impose a non-guideline sentence.

15    So I want to state, first of all, for the record that
16 I have read all of the submissions by the parties, the chart
17 that I requested be filed by the government that relates
18 information about especially co-defendants that I've
19 sentenced, and those sentencings are part of the public
20 record.

21    I've also read all of the submissions by the defense,
22 which are extensive, and include a letter from
23 Mr. Zambada-Niebla, a letter from his wife, and thereafter 20
24 character reference letters from different family members and
25 associates of Mr. Zambada-Niebla, as well as articles that

10:35:09
10:35:23
10:35:50
10:36:21
10:36:45

1    talk about his testimony in New York and events that have

2    occurred in the State of Sinaloa, Mexico.

3         With that, I think we'll proceed to the government's

4    allocution as to what it believes is an appropriate sentence.

5         MS. CSICSILA:  Thank you, Your Honor.

6         THE COURT:  So the government can proceed.

7         MS. CSICSILA:  Thank you.

8         And as you just noted, both parties have made a very

9    fulsome presentation to the Court regarding both the

10   defendant's conduct and then the 3553 factors, as well as the

11   defendant's cooperation, so we won't belabor all those points

12   again here.  There are just a few points that we want to

13   highlight.

14        And I think I would start first with the seriousness

15   of the offense which the Court must consider.

16        This Court has presided over the case, this case, for

17   almost ten years, and through that ten years, you have gotten

18   to know this particular defendant's case, but also learned

19   about the cartel and the defendant's co-defendants, and,

20   therefore, the defendant's conduct as well through presiding

21   over those other cases that have been before you over the

22   course of ten years.

23        Now, there's no question that the defendant's conduct

24   has caused immense harm, harm to individuals in Mexico, but

25   also in this city and throughout the United States, and it's

1    serious conduct that warrants a serious sentence.  But for the

2    defendant's cooperation, and as the Court just noted, the

3    defendant's conduct would call for a life sentence under the

4    guidelines.

10:38:33

5         But the Court, as you know, must consider the entire

6    picture, which includes the defendant's conduct -- excuse

7    me -- cooperation, and that cooperation was extensive, has

8    been lengthy, and also consider his character and the history

9    and characteristics of this particular defendant.

10:38:51

10        And on that front, what speaks quite loudly about the

11    defendant's characteristics is how this cooperation came to

12    be.  The defendant approached the DEA about cooperating

13    over -- approximately ten years ago, and after he was arrested

14    and extradited and brought to the United States, he began

10:39:14

15    cooperating extensively with the government.  That cooperation

16    has been continuous and steady, and the government fully

17    expects and the defense has represented and the defendant has

18    represented that that cooperation will continue on after the

19    sentencing here today.

10:39:30

20        Again, we've detailed a lot of the cooperation before

21    the Court, but our partners from D.C. are here, and

22    Ms. Liskamm, who's from -- was working in the Narcotics and

23    Dangerous Drug Section in D.C. and more recently is with the

24    Office of the Deputy Attorney General, would like to say a few

10:39:51

25    words to the Court about the defendant's recent cooperation in

1  connection with the Chapo Guzman trial.

2  　　　　THE COURT:  Okay.

3  　　　　MS. LISKAMM:  Good morning, Your Honor.

4  　　　　THE COURT:  Good morning.

10:40:01

5  　　　　MS. LISKAMM:  I was a member of the trial team that

6  prosecuted Chapo Guzman, and Mr. Zambada was one of my

7  witnesses that I put on at trial.  I just wanted to speak to

8  what an integral role he played in that prosecution for the

9  government.

10:40:14

10  　　　　Due to Mr. Zambada's role in the Sinaloa Cartel, he

11  was able to provide the jury with a really unique look and

12  perspective into the inner workings of that cartel.  He was

13  able to speak to the numerous wars the Sinaloa Cartel engaged

14  in with the Beltrán-Leyvas, the Arellano Felixes and the

10:40:33

15  Carillo Fuenteses.  He was able to speak to the drug

16  trafficking activities of Chapo Guzman and other leadership

17  within the cartel to include the routes, the methods and

18  specific loads and seizures that we were able to link up

19  throughout the trial, and he spoke -- was able to speak to the

10:40:52

20  corruption payments that were being made to government

21  officials that helped further the cartel activities.

22  　　　　In providing the jury with that unique look inside

23  the cartel, not only did he lay out Chapo Guzman's leadership

24  role within that cartel, but in so doing, he also explicitly

10:41:10

25  laid out his father's role in that cartel, which I think is

1     unique.  He spoke to not only to his father's role but other

2     family member's role within the cartel, which I'm sure Your

3     Honor is aware is somewhat remarkable.

4           In preparation for the trial, we spent dozens and

5     dozens of meetings together going through his testimony.

6     Numerous times he was asked to repeat stories over and over

7     again so we can prepare, and his demeanor and attitude during

8     those preparation sessions was truly remarkable.  He came in

9     with a positive attitude.  He was there, willing and able to

10    cooperate at every moment, and I think that speaks volumes.

11          In my career as a prosecutor, he is one of the most

12    cooperative individuals that I have worked with, and I think

13    that the Court should be aware of that in fashioning a

14    sentence for him.

15          Thank you.

16          THE COURT:  Thank you very much.

17          MS. CSICSILA:  Judge, I just have a few additional

18    points, and stepping away from what Ms. Liskamm just said, the

19    defendant has continuously cooperated and steadily cooperated

20    and done so at an extraordinary level.  It hasn't been without

21    cost.

22          And so the government believes that there's a need

23    for the sentence to incentivize in many ways other criminals

24    who are out there engaged in serious drug trafficking who are

25    thinking about cooperating with the government and changing

1    their lifestyle.  They can look to this defendant and see that

2    change is possible and that they can right the wrongs and also

3    be treated by the government and the judicial system fairly

4    and appropriately in receiving a sentence for their conduct.

5    The last thing I'd like to speak to is just the

6    government's recommendation of 17 years.  In fashioning that

7    recommendation, the government spent a lot of time, you know,

8    obviously thinking about and discussing an appropriate

9    sentence and what we would recommend to the Court as an

10   appropriate sentence.  And one of the first places we looked

11   to is what have other comparable defendants received for a

12   sentence, other cooperating defendants who are comparable to

13   this defendant.

14   And as the Court knows, there are no exact

15   comparables.  This is a unique defendant who's in a unique

16   position in the cartel and also has provided unique

17   cooperation.

18   But one close analogy is the cooperation and the

19   sentences of the Flores brothers, and this Court is very

20   familiar with their case and their sentencing, you imposed

21   their sentence, and at the time of their sentencing, you

22   determined that their conduct and their cooperation, balanced,

23   warranted a sentence of 12 years.  They did not have perfect

24   cooperation, as the Court noted, and so you imposed a 14-year

25   sentence, but looking on balance at the cooperation and the

1  conduct in the whole picture, the Court stated 12 years.

2       The government believes that a sentence is

3  necessarily -- a higher sentence is necessary for this

4  defendant, given his conduct, and so the government,

5  therefore, is recommending 17 years for this defendant.

6       THE COURT:  Thank you.

7       Let's turn then to the defense.

8       MR. PEREZ:  Thank you, Your Honor.

9       THE COURT:  Mr. Perez.

10       MR. PEREZ:  Thank you.  I'll be very brief in my

11  remarks, Your Honor.  You have all the material that we've

12  submitted.

13       I would like to say that I've been on the defense

14  team for the past four years, and I've spent hundreds of hours

15  with the defendant.  I've learned about his character.  I have

16  been with him through the ups and downs of the past four

17  years, also with the trial prep.  And I guess one thing that

18  stuck out to me is he never let anything really get him down.

19  He was always ready to do what he had to do.

20       And his case was set for sentencing several times,

21  and he was always very, very disappointed when the government

22  said we need just a little more time.  It was very, very hard

23  on him and his family, and he suffered through that.

24       We had many, many conversations prior to his

25  testimony against Joaquin Guzman-Loera, Chapo Guzman.  He

1  struggled with that.  He did not want to testify.  He was

2  concerned about the consequences.  I mean, he suffered.  A lot

3  of his friends, family members have been killed, and he

4  worried what would happen if he testified again?

10:46:05

5  But what he told me was that he made a decision when

6  he contacted the government that he wanted no part of that

7  life anymore.  He felt it was his responsibility to live up to

8  his obligations to the government.

9  He did not want his family to have the same life that

10:46:29

10  he did.  He wanted to get out of that life.  Just recently,

11  last week, we talked about his son graduating from college.

12  He received an associate's degree in automotive design and

13  real estate.  And Mr. Zambada became very emotional when he

14  told me that when I was 11 years old, they shot my grandmother

10:46:56

15  and they shot my mother.  They made their first attempt on my

16  life when I was 16.  That was the first of many.  He said, I'm

17  just so happy that my son is here and he's having a different

18  life.

19  It was very, very tough for him to be a witness

10:47:18

20  against his own father.  He struggled with that.  After his

21  testimony, he heard about the articles, about a son betraying

22  his father, and to this day, he still deals with that, and

23  it's a very difficult situation to deal with.

24  At the end of the day, he testified.  He did so

10:47:41

25  without minimizing his own conduct or that of his father's.

1      I've also witnessed the struggles his wife went

2   through being a single mother, his kids growing up without a

3   father.  Both him and his wife feel responsible for the deaths

4   in Mexico related -- related to them.  They were looking for

5   them.  They could not find them, so they killed friends and

6   family.

7      Mr. Zambada has been a model prisoner.  No

8   disciplinary actions.  I've spoken to everyone on staff at all

9   facilities.  No one had a bad thing to say about him.

10     He's taught himself to paint.  He's taught himself to

11  play the piano, to play the guitar.  He's read over 400 books.

12     Because of the extraordinary unique nature of this

13  case, it makes accurate sentencing comparisons difficult.

14  While no two cases are alike, this is especially true here.

15     I submit to the Court that Mr. Zambada has

16  sufficiently -- has been sufficiently punished.  He's spent

17  over 700 hours in solitary.  This is very, very difficult time

18  for him, something that still affects him to this day -- I'm

19  sorry, 700 days for sentencing -- in solitary confinement.  He

20  also waited 10 years to be sentenced.

21     Your Honor, we respectfully request a 12-year

22  sentence for the defendant.  We feel he's been punished

23  enough.  We'd ask you to grant the government's 5K1.1 motion,

24  and we request additional reduction credit on the 3553(a)

25  factors in this case.

1       THE COURT:  Mr. Zambada-Niebla, you have an

2   opportunity, if you wish, to address the Court before I

3   sentence you.

4       Do you wish to say something?

10:49:50    5       THE INTERPRETER:  Could we have change of

6   interpreter?

7       THE COURT:  Sure.

8       THE DEFENDANT:  Yes, Your Honor.

9       THE COURT:  Good morning.

10:50:08    10      THE DEFENDANT:  Good morning.  First of all, I would

11  like to thank you for having me here today, on this day that

12  I'm going to receive my sentence.  I've waited for a long time

13  for this day to come, and today we are here thanks to you.

14  That's why I would like to first of all thank you.

10:50:35    15      I would also like to thank you for the opportunity to

16  express all of my regret and repentance for the bad decisions

17  that I made in the past.

18      And the best way to start off, I believe, is asking

19  all those people for forgiveness that -- that in one way or

10:51:11    20  another I hurt directly or indirectly.

21      I would also like to ask my children, my wife, and

22  the woman that gave me life, which is my mother, for

23  forgiveness because they have also suffered much from all that

24  we have been going through.

10:51:37    25      I believe that every man or every person turns his

1   life or leads his life on the basis of good or bad decisions.

2   Like I mentioned earlier, I made some bad decisions, which I

3   accepted and I continue to accept full responsibility for and

4   for which I truly regret for having made.

5   I would like to tell you, Your Honor, that this

6   repentance did not come about just yesterday, nor did it come

7   about just today because I'm in front of you about to receive

8   my sentence.  I would like to tell you respectfully that this

9   feeling of regret or repentance has been with me for years,

10  and I think that the people next to me here, the government

11  and my attorneys, won't allow me to lie to you because I've

12  proven my repentance with deeds or facts and not with words

13  only.

14  Like I said earlier, I still have my children, my

15  wife, who I love with all of my heart and are the most

16  important things for me, them and my closest family members

17  are the ones that have sustained me with a lot of faith and a

18  lot of hope to keep going, also to become a better person.

19  Today -- today I feel I can be a better father, a better

20  husband.  I feel I can be a better son, and, most of all, a

21  better human being.

22  I've sacrificed a lot by leaving and taking them out

23  of the world in which we lived in.  I would like to tell you,

24  Your Honor, that without hesitation, I would do it all over

25  again as long as I can see them happy, free of all fear, see

1    them live a peaceful life and most of all a happy life.

2         I think everyone deserves a second chance.  Today,

3    that opportunity you have in your hands.  I would like to tell

4    you with the utmost respect that whatever you decide today, I

5    will accept it with the most responsibility.

6         I would like to thank the representatives of the

7    government.  I would like to thank my defense attorneys for

8    the whole time that they've stood by my side, helping me to

9    make now the best decisions for myself and for my family and

10   my life.

11        Your Honor, thank you.  That is all.

12        THE COURT:  Well, Mr. Zambada-Niebla, the time has

13   come to make a decision as to what to do, and there is nothing

14   easy about sentencing any individual, and sentencing you is

15   incredibly difficult for a lot of different reasons.

16        I want to commend the attorneys for making this so

17   difficult.  I have very carefully read all of the submissions,

18   all of the letters, to try and determine what is the right

19   outcome here, and there are a couple of things I will be

20   referring to.

21        So one of the things that I've had to do during my

22   25 years on the bench is always grapple with the offense

23   involved.  And I will tell you, Mr. Zambada-Niebla, I've been

24   involved in the criminal justice system since I was 19 years

25   old.  So for over 40-something years, I have seen what drugs

1    have done to this country, to this city, and the repercussions

2    are very high.

3         Oftentimes, I've complained to prosecutors during my

4    25 years on the bench that we had the wrong people in front of

5    me, and I was sentencing the wrong people, and I would

6    complain that we needed to go higher up. And it is very clear

7    to me that you are probably one of the highest people I have

8    ever sentenced since I've been on the bench, and your offense

9    is very significant.

10         According to the government in its own submission

11    asking for a 17-year sentence, they state that between

12    approximately 1996 and 2008, you oversaw massive shipments of

13    narcotics from Central and South America into Mexico and

14    eventually into the United States. And I understand that how

15    you came about doing that was the circumstances of the family

16    you were born into, and I will certainly take that into

17    account as to how that came about. It's not like you went out

18    and decided you wanted to join this organization. In effect,

19    you were born into the organization that existed.

20         I've also looked very closely, very closely, at your

21    testimony in the case of United States versus Guzman-Loera.

22    And just to pause on that, I will tell you that since I was

23    assigned to this case, I was fully prepared to try every

24    single defendant assigned to me, including Mr. Guzman-Loera,

25    even though, even though out of all the judges on this Court,

1    I was the only one that had any Mexican blood running through

2    his or her veins, but your testimony in that case goes

3    something like this:

4            "Question:  Okay.  Mr. Zambada, have you ever

5    personally killed anyone?

6            "Answer:  No.

7            "Okay."  The next question:  "Have you ever relayed

8    any orders for someone to die?

9            "Answer:  Yes, several times.

10           "Question:  How many times?

11           "Answer:  I don't know, but there were several

12   times."

13           And then you related that you did that under orders

14   from other people, and you were basically the middle person.

15           So the repercussions of the offense are just

16   tremendous.  There's been a lot of talk by many in Washington

17   about a border crisis, and I've said publicly over and over

18   again that the only crisis that exists close to the

19   U.S.-Mexican border is in Mexico.  That is where the crisis

20   exists because last year alone, over 30,000 people died there,

21   and we sit here in this country pretending like that is not

22   the case, pretending like our neighbors to the south have not

23   lost that number of people.

24           Now, I don't have to lecture you about loss because

25   you know what I'm talking about.  From reading the

1    submissions, many of the people that you knew, many of the

2    people that your relatives know have died violent deaths, and

3    I know that your family has suffered.  And it is shameful that

4    these drug wars continue and that the value of life in a

5    country that I personally love a great deal means nothing.

6    Instead, many in Washington want to build a wall when most of

7    these drugs are coming in in a fashion that a wall will do

8    nothing, nothing about.

9         I've been involved in the front end of the so-called

10   war on drugs.  I have personally put my life on the line,

11   dealing with Colombian drug dealers, and I would be the first

12   one to admit here in open court on the record after 25 years

13   of being a federal judge that if there is a so-called drug

14   war, we have lost it.  We have lost it.  And it's time for

15   this country to think about doing something different.

16        And I understand the need for these prosecutions.

17   Certainly there is a need.  But there also is a need to spend

18   money on treatment, and there is a need to do something about

19   our country's demand for all these drugs because if we don't

20   address that demand, there will be people that come beyond

21   your family, beyond Mr. Guzman's family, there will be plenty

22   of people that will fill the role of sending drugs to this

23   country.  And all that happens is money goes back to Mexico,

24   but more importantly, weapons go back to Mexico that are used

25   to kill other people.  And not one single weapon is

11:01:08

11:01:30

11:01:53

11:02:15

11:02:36

1 manufactured in Mexico. They're all coming from the United

2 States, and that is the sad world that we live in.

3 But that, by being involved in this offense, you

4 certainly facilitated this whole dimension of people dying,

11:03:00  5 and I have to consider that.

6 Another thing that I very, very carefully considered

7 is what have I personally done in sentencing other people

8 involved in this case because there is a need to avoid any

9 type of sentencing disparity. But the key thing with regard

11:03:20  10 to that, because you cannot compare one case to another case

11 without taking into consideration your own unique situation

12 and then -- and this is another thing I want to talk a little

13 bit about -- your cooperation.

14 Now, that term, cooperation, has now all of a sudden

11:03:45  15 in this country become something that is looked down upon.

16 And, frankly, I don't understand it from my vantage point of

17 25 years on the bench, from my vantage point of having

18 prosecuted cases because the reality is in this country, 20 to

19 30 percent of all the cases prosecuted in the criminal justice

11:04:11  20 system rely on cooperating individuals. If you don't have

21 cooperation, you cannot have successful prosecution, but yet

22 we see people from on high in Washington, D.C., people from in

23 this city talking about cooperation like it is a bad thing.

24 I won't name who this person is, but someone in

11:04:39  25 Washington, D.C. said that flipping should be outlawed, that

1     someone who cooperates with the Justice Department is a rat.

2          Are you kidding me?  Are you kidding me?

3     Cooperators, who are they cooperating with?  They are

4     cooperating with the Justice Department who are prosecuting

5     cases.

6          It is sad that the coverage of your case,

7     Mr. Zambada-Niebla, goes something like this, this was the

8     paper on Sunday:  "The Cartel Kid Who Sold Out El Chapo."

9          As far as I'm concerned, you did not sell out El

10    Chapo.  I think it went the other way around.  You cooperated

11    with the United States of America.  That's what happened.  And

12    if we don't have cooperation, if we don't have cooperation,

13    the Justice Department just doesn't win cases.

14          So maybe, maybe people in Washington are upset about

15    certain individuals and are upset about whether or not they're

16    telling the truth, but I've even seen elected officials here

17    in Chicago, when it became apparent that someone had

18    cooperated undercover in Chicago, talk about who was the

19    person who ratted other people out.  Who was the person --

20    they're almost talking like organized crime figures.

21          And the reality is if you don't believe a cooperator,

22    it really comes down to is there something that really is

23    backing up the cooperation.

24          So in other words, Mr. Zambada-Niebla, when you

25    cooperated, did you cooperate truthfully?  Well, the jury has

1    already decided that you cooperated truthfully.  And why is

2    that?  Because of a key concept that comes along, another C

3    word with cooperation, and that is corroboration.  Was there

4    corroboration?  Was there other evidence to show that you were

5    telling the truth?

11:06:58

6         And most of the time when the government is

7    successful using testimony from cooperators, there is

8    corroboration.  Sometimes it's tape recordings.  Sometimes

9    it's documentary evidence.  Sometimes it's evidence.

10   Sometimes it's drugs, but there usually is corroboration.

11:07:19

11        And so what I would tell you is you made the right

12   decision in cooperating.  I find your cooperation to be

13   extraordinary.  I think that other people should be commended

14   and not slandered for cooperating with the Justice Department.

15   And if people were right-thinking, they would value

16   cooperating witnesses because cooperating witnesses help our

17   country win the war on crime.  And maybe we've lost the war on

18   drugs, but we cannot afford to lose the war on crime.

11:07:47

19        And so then uniquely, I look at your own situation.

20   What is the situation with regard to you?  Are you capable of

21   leading a lawful life?  And I conclude that you are, that you

22   can lead a lawful life.

11:08:14

23        As you've spoken about, you have something that is

24   also extraordinary.  You have the support of your own family.

25   You have extraordinary support from your wife, who has stuck

11:08:38

1    with you through thick and thin.  No matter what, she has been

2    with you.  Your children, other members of your family.  I've

3    read letters from other people who I won't mention because I

4    value their security, so I don't want to get into specifics,

5    but it's clear to me that you have family support.

6          Are you smart?  Are you capable?  Absolutely.

7    Unfortunately, you used some of those tools the wrong way, and

8    you need to get to a point where you start using them in the

9    right way.

10         And so after very, very carefully evaluating both of

11   the submissions by the defense, by the government, it is my

12   considered judgment that the appropriate sentence for you is

13   to sentence you to a 15-year sentence.  And that is a sentence

14   of 180 months in the custody of the Attorney General.

15         You will get credit, as far as I'm concerned, for all

16   the time you have already served, including the time that you

17   were held in the custody of Mexican officials.  Part of my

18   conclusion with regard to this sentence is, yes, I am

19   sentencing you higher than I've sentenced the Flores brothers,

20   but I've also taken into consideration, in not imposing the

21   17-year government recommended sentence, the manner in which

22   your cooperation has occurred; also the manner in which you

23   were held before I entered an order taking you out of solitary

24   confinement; and the manner in which you have had to wait a

25   full ten years to get to this point and being sentenced.

11:09:05
11:09:23
11:09:51
11:10:18
11:10:43

1    After your release from custody, you will be placed

2    on supervised release, and now we're going to talk about the

3    conditions of your supervised release. And if you have any

4    objection, Mr. Perez, to any of these conditions when I

5    mention any of them, you can let me know.

6         MR. PEREZ: Yes, Your Honor.

7         THE COURT: So first of all, the mandatory conditions

8    of supervised release pursuant to 18 U.S.C. 3583(d) will

9    apply; that is, No. 1, you cannot commit any other federal,

10   state or local crime.

11        No. 2, you shall not unlawfully possess a controlled

12   substance. I don't think that's an issue for you, but I will

13   impose that mandatory condition.

14        No. 5, you shall cooperate in the collection of a DNA

15   sample.

16        Now we're going to move to the discretionary

17   conditions of supervised release pursuant to 18 U.S.C.

18   3563(b), and 18 U.S.C. 3583(d).

19        No. 1, you shall provide financial support to

20   dependents if you're financially able to.

21        No. 4, you shall seek and work conscientiously at

22   lawful employment or pursue conscientiously a course of study

23   or vocational training that will equip you for employment.

24        Condition No. 6 is that you shall not knowingly meet

25   or communicate with any members or associates of the Sinaloa

1  Cartel.

2         MR. PEREZ:  Your Honor, that's the --

3         THE COURT:  Okay.  That's the condition you're

4  objecting to.

11:12:39   5         MR. PEREZ:  Yes, Your Honor.

6         THE COURT:  And I take it you're objecting to it

7  because of the definition of what is a member of the Sinaloa

8  Cartel.

9         MR. PEREZ:  Yes, Your Honor.

11:12:49  10         THE COURT:  Okay.  How does the government want to

11  handle that proposed condition?

12         MS. CSICSILA:  Judge, the condition reflects that the

13  defendant is prohibited from engaging -- or associating with

14  any persons who are known to be engaged in or planning to

11:13:04  15  engage in criminal activity.

16         THE COURT:  Okay.

17         MS. CSICSILA:  I think the defendant is aware of the

18  scope of that prohibition.

19         THE COURT:  Okay.

11:13:11  20         MS. CSICSILA:  And so because of the ambiguity in the

21  members and associates language, it seems a little difficult

22  to apply, so we would just ask that that box not be checked,

23  and he just be prohibited --

24         THE COURT:  Okay.  That box will not be checked, and

11:13:24  25  I should have said this going into this, just so you know it's

1   five years of supervised release that these conditions will

2   apply to.

3   So Condition No. 6 is going to read:   "You shall

4   refrain from knowingly meeting or communicating with any

5   person whom you know to be engaged or planning to be engaged

6   in criminal activity," and I will not check the box.

7   Condition No. 7 is to refrain from any excessive use

8   of alcohol, and that's defined as having a blood alcohol

9   concentration greater than 0.08 percent.

10   Condition No. 8, you shall refrain from possessing a

11   firearm, destructive device, or other dangerous weapon.

12   Condition No. 14 is you shall remain within the

13   jurisdiction where you are being supervised unless granted

14   permission to leave by the Court or a probation officer.

15   Condition No. 16 is you shall permit a probation

16   officer to visit you at any reasonable time at home, and that

17   is the only place I will allow the visit to occur.

18   Condition No. 17 is you shall notify a probation

19   officer promptly within 72 hours of any change in your

20   residence, employer or workplace and, absent constitutional or

21   other legal privilege, answer inquiries by a probation

22   officer.

23   Condition No. 18 is you shall notify a probation

24   officer promptly within 72 hours if arrested or questioned by

25   a law enforcement officer.

1      That's it in terms of the discretionary conditions.

2      I'm required to tell you that you have a right,

3  Mr. Zambada-Niebla, to appeal this sentence.  It is my

4  judgment that this is a sufficient but no greater sentence

5  under 3553 and all the factors, but you can appeal the

6  sentence by filing a notice of appeal within 14 days.  I know

7  you have a number of attorneys representing you, but if you

8  need court-appointed counsel, you could request one from the

9  Court of Appeals.

10      I have an agreed motion of the United States for the

11  entry of a preliminary order of forfeiture, and that has been

12  agreed to, right?

13      MR. PEREZ:  Yes, Your Honor.

14      THE COURT:  And that is for forfeiture of

15  $1,373,415,000; is that correct?

16      MS. CSICSILA:  Correct.

17      THE COURT:  I will enter that order as of today's

18  date.

19      Okay.  This sentence is concurrent for both the D.C.

20  case as well as my own case.  So we're talking about 09

21  CR 383, as well as the case transferred in from D.C., so this

22  also includes 18 CR 484.

23      There also is a special assessment for both cases,

24  $100 for both indictments.  So that's a total of $200 with

25  regard to the special assessment.

1       Now, is there anything we haven't covered?

2       MS. CSICSILA:  Judge, we haven't discussed fines, but

3  in light of the forfeiture allegation, a fine at this point

4  seems excessive and unnecessary, so the government wouldn't

5  recommend one.

6       THE COURT:  Okay.  I agree with the government, and

7  so I will not impose a fine.

8       MS. CSICSILA:  There's no restitution in this case.

9       THE COURT:  Okay.

10      MS. CSICSILA:  And, also, the Court has not addressed

11 the cost of prosecution.

12      THE COURT:  Okay.  Do you have a request with regard

13 to the cost of prosecution?

14      MS. CSICSILA:  Judge, again, in light of the

15 forfeiture allegation and order, the government's not seeking

16 cost of prosecution.

17      THE COURT:  Okay.  I will not impose the cost of

18 prosecution against Mr. Zambada-Niebla.

19      Anything else?

20      MS. CSICSILA:  Judge, the one last piece is my

21 understanding from your statements is that it's your intent

22 that the defendant spend 180 months in prison in total.

23      THE COURT:  In total.

24      MS. CSICSILA:  You had asked for the government to

25 look into how and whether the BOP gives credit for time spent

1    in a foreign prison, and it's quite a complicated morass, at

2    least for me --

3          THE COURT:  Okay.

4          MS. CSICSILA:  -- and for my colleagues to try to

5    decipher, so one suggestion that the government has is --

6          THE COURT: Okay.

7          MS. CSICSILA: -- to have the J&C reflect a sentence

8    of 169 months --

9          THE COURT:  Okay.

10         MS. CSICSILA:  -- which would then take into account

11   the 11 months of credit for the time in a Mexican prison.

12         THE COURT:  Okay.  That would be the absolute way to

13   assure that Mr. Zambada-Niebla gets credit for his time in a

14   Mexican jail.

15         MS. CSICSILA:  Correct.

16         THE COURT:  Okay.

17         MS. CSICSILA:  And then we would ask, too, that the

18   J&C include something along the lines of "This sentence

19   includes and it already takes into account credit for

20   11 months of custody served in Mexico from March 18th, 2009 to

21   February 18th, 2010."

22         THE COURT:  Okay.  Can you give me those dates again?

23         MS. CSICSILA:  March 18th, 2009 to February 18th,

24   2010.

25         THE COURT:  Okay.  We will do that.

1    MS. CSICSILA:  Thank you, Judge.

2    THE COURT:  I take it the defense agrees.

3    MR. PEREZ:  Yes, Your Honor.

4    THE COURT:  Okay.  Anything from the defense?

11:20:09   5    MR. PEREZ:  No, Your Honor.

6    THE COURT:  Then we have concluded.  Thank you very

7  much.

8    MS. CSICSILA:  Thank you, Your Honor.

9    MR. PEREZ:  Thank you.

11:20:17   10    THE DEFENDANT:  Thank you.

11    (Which were all the proceedings heard.)

12                        CERTIFICATE

13    I certify that the foregoing is a correct transcript from

14  the record of proceedings in the above-entitled matter.

15  */s/Kathleen M. Fennell*          *May 31, 2019*

16  _____    _____

17  Kathleen M. Fennell                  Date
    Official Court Reporter